## State of Vermont v. Eric J. Kindle

[751 A.2d 757]

No. 99-041

Present: **Amestoy, C.J., Dooley, Morse, Johnson and Skoglund, JJ.**

Opinion Filed January 14, 2000

*Lauren Bowerman*, Chittenden County State's Attorney, and *John R. Treadwell*, Deputy State's Attorney, Burlington, for Plaintiff-Appellant.

*Robert Andres* and *James Karns*, Law Clerk (On the Brief), Burlington, for Defendant-Appellee.

**Morse, J.** The State appeals from the district court's decision suppressing evidence of defendant Eric Kindle's driving while intoxicated obtained from a motor-vehicle stop. The only issue on appeal is whether the observance of a red beam of light emanating from a passing car justified an investigatory motor-vehicle stop. We hold that it does and, therefore, reverse.

Defendant was charged with operating a motor vehicle while under the influence of an intoxicating liquor in violation of 23 V.S.A. § 1201(a)(2). The court granted defendant's motion to suppress based on the following facts.

At approximately 2:10 a.m. on August 21, 1998, two Burlington police officers were stopped at a red light at the intersection of East and Colchester Avenues. While awaiting the light change, a vehicle operated by defendant passed through the intersection from the officers' left to right. As the car traveled in front of the officers, they observed a steady red beam of light pass across the windshield of their cruiser. Concluding that the beam resembled a laser-sighting device sometimes used for aiming a firearm, they pursued defendant and stopped him.

The officers ordered defendant and his passenger out of the vehicle. A protective pat-down revealed that the passenger possessed a type of hand-held laser pointer typically used as a visual aid for presentations, not a gun sight. Simultaneously, the officers noticed signs of defendant's intoxication which provided the basis for the DUI charge.

Defendant moved to dismiss the DUI charge claiming that the officers lacked reasonable suspicion to stop him. After a hearing, the court granted the motion concluding that the events leading to the traffic stop did not constitute reasonable suspicion because neither

defendant nor his passenger had threatened the officers' safety. The court noted both that defendant's vehicle had traveled away from the officers, thereby removing any concern for their safety, and hand-held laser pointers are commonly used. The court granted the State's request for permission to appeal its ruling. See V.R.A.P. 5(b).

In order to lawfully stop defendant's vehicle, the officers must have had a reasonable and articulable suspicion of criminal activity. See *State v. Welch*, 162 Vt. 635, 636, 650 A.2d 516, 517 (1994) (mem.). The reasonable suspicion standard "requires some minimal level of objective justification for making the stop." *State v. Lamb*, 168 Vt. 194, 196, 720 A.2d 1101, 1102 (1998); see also *State v. Kettlewell*, 149 Vt. 331, 335, 544 A.2d 591, 594 (1987) (test is whether, looking at entire picture, police officers could reasonably surmise that occupants of vehicle they stopped were engaged in unlawful activity).

Looking at the whole picture, it was reasonable for the officers to have thought that an occupant of the car might have been engaged in criminal activity; specifically, pointing a firearm at others. In Vermont, pointing a firearm at another is unlawful. See, e.g., 13 V.S.A. §§ 4011 (intentionally aiming firearm towards another punishable by fine), 1025 (knowingly pointing firearm at or in direction of another presumed to be reckless endangerment), 1023 (simple assault includes attempt by physical menace to put another in fear of imminent serious bodily injury). Here, two officers witnessed a red beam, which resembled the beam from a laser-sighting device coming from a passing vehicle, arc across the windshield of their cruiser at approximately two o'clock in the morning. The misconduct the officers inferred was not limited to that which threatened only their safety, but applied to anyone at whom the beam was directed.

While an officer may not act on an unparticularized hunch, witnessing a red laser beam emanating from a car is a specific, articulable fact. The officers had more than a "hunch" that, at two o'clock in the morning, the beam might indeed be a sighting device attached to a weapon pointed outward from the vehicle. It was an exceedingly rational inference. See *State v. Ryea*, 153 Vt. 451, 454, 571 A.2d 674, 675 (1990) ("In order to make a valid investigative stop, the police officer must be able to point to specific and articulable facts which, together with the rational inferences taken therefrom, reasonably warrant the intrusion.").

The possibility that a benign hand-held device that is readily available to the public generated the beam does not render the inference irrational. Laser-sighting devices are a part of the gun

culture. For example, in February 1996, Congresswoman Rosa L. DeLauro introduced the Laser Assisted Gun Crime Penalty Act, which sought to increase penalties under the United States Sentencing Guidelines for individuals convicted of crimes involving laser sights. See 142 Cong. Rec. H1620-21 (daily ed. Feb. 29, 1996). In her introduction, Congresswoman DeLauro noted that "[l]aser sights have become a new rage, the latest deadly fad." *Id.* In May 1996, while proposing similar legislation, Congresswoman DeLauro further remarked on the issue:

> Proliferation of this new technology is growing at an alarming rate among street thugs in communities across America. On Christmas Day of last year and during the first few weeks of the New Year, guns equipped with laser sights have taken lives and evoked fear amongst families in my district.

142 Cong. Rec. H4487 (daily ed. May 7, 1996).

Other legislators have attempted to regulate laser sights. Congressman Rod Blagojevich introduced such a bill in July 1999. It included congressional findings that the "risk to our Nation's law enforcement officers increases when violent offenders possess lethality-enhancing devices, such as laser sights, that are easily accessible and highly unregulated." H.R. 2421, 106th Cong. § 2 (1999).

Similar concern has been expressed in the Senate. In a congressional report concerning the Violent and Repeat Juvenile Offender Act of 1997, several Senators observed that the "proliferation of laser sighting devices . . . is putting police officers and our communities at greater risk. As an advertisement for the 'LaserMax' brags, the laser-sight provides 'unquestionable intimidation.'" S. Rep. No. 105-108, at 204 (1997).

Finally, two states have declared certain uses of laser-pointing devices unlawful. In Illinois, it is a misdemeanor to knowingly aim a laser pointer at a peace officer. See Act of July 23, 1999, No. 91-252, § 24.6-20, 1999 Ill. Legis. Serv. (WESTLAW). Similarly criminalizing certain uses of laser pointers, the Washington legislature found that:

> [L]asers are becoming both less expensive and more accessible in our technologically advanced society. Laser devices are being used by individuals in a manner so as to intimidate and harass. This creates an especially serious problem for law enforcement officers who reasonably believe they are the target of a laser sighting device on a

firearm. Additionally, emergency service providers, service providers, and others who operate aircraft or motor vehicles may be negatively affected to the point of jeopardizing their safety as well as the safety of others. In order to address the misuse of lasers, the legislature hereby finds it necessary to criminalize the discharge of lasers under certain circumstances.

Act of May 5, 1999, ch. 180, § 1, 1999 Wash. Legis. Serv. (WESTLAW).

■ We conclude that the officers acted reasonably in surmising that the red beam of light that passed across their field of vision came from a laser-sighting device attached to a firearm. Consequently, their stop of defendant's motor vehicle for investigatory purposes was lawful.

*Reversed.*

**Johnson, J.,** dissenting. I respectfully dissent from the Court's determination that it was reasonable for the police officers to stop defendant based on the appearance of a red dot of light traveling across their field of vision. Officers must have a "reasonable and articulable suspicion that a person . . . has committed or is about to commit a crime" to make a limited investigatory seizure under *Terry v. Ohio*, 392 U.S. 1 (1968). See *State v. Hollister*, 165 Vt. 553, 553, 679 A.2d 883, 884 (1996) (mem.). In evaluating whether officers had a reasonable and articulable suspicion, we look at "the totality of the circumstances." See *State v. Crandall*, 162 Vt. 66, 70, 644 A.2d 320, 323 (1994). Taking the totality of circumstances into account here, I cannot find that the officers' suspicion that defendant's passenger was intentionally pointing a laser-sighted firearm at them was reasonable.

The officers were stopped at a red light, and defendant drove his car across the intersection under a green light. Officer Blake testified that a small red light flashed across the windshield and the officer's face. Blake mentioned it to Officer Dumas, who said he had seen the same thing. While they had this discussion, defendant's car continued across the intersection and down the road, away from the officers' car. The officers then decided to follow the car, turned the corner after it, and activated their lights. They pulled the car over about a quarter-mile past the intersection. The State suggests that the officers could have suspected a number of crimes, including 13 V.S.A. § 4011 (aiming gun at another), or 13 V.S.A. § 1025 (recklessly endangering another person) (presumption of recklessness and danger exists

where a person "knowingly points a firearm at or in the direction of another"). Both of these crimes require an element of intent implausible in these circumstances.

In making this stop, the officers leapt to a number of conclusions. First, they assumed that the red light was a laser-sight on a firearm, despite the fact that Officer Blake admitted being aware that laser pointers are widely available and used as everything from a business accessory to a toy. Next, they assumed that the chance encounter at the intersection somehow prompted defendant intentionally to aim a firearm at their car. Then, they must have assumed that the red light that flashed over their car was aimed precisely at their bodies, inside the darkened car (since the crimes alleged to have been suspected require the *intentional* direction of a firearm or other threat at a person). And despite the fact that the car continued down the road and away from them, the officers must have assumed that the occupants of that car had intentionally aimed a gun at them and then immediately grown disinterested and drove away.

While it might be reasonable to assume a small red light could be a laser-sight on a firearm, all the other circumstances of the incident fail to support such an assumption. The car was operated normally; it was a momentary, chance encounter at an intersection; and the occupants, which these officers thought posed such a threat to their safety, drove through the intersection and away from the police car, evidencing no interest in it at all. The State relies on *State v. Santacruz-Betancourt*, 969 P.2d 1040 (Or. Ct. App. 1998), *cert. denied*, 987 P.2d 513 (Or. 1999). There, the defendant aimed a laser beam inside a house, first at the forehead of an elderly man and then at the forehead of an elderly woman. The defendant's car was seen outside the house at the time by a person in the kitchen with the elderly couple. The trial court suppressed the stop and the appellate court reversed. According to the appellate court, the suspicion was reasonable under those circumstances. See *id.* at 1043.

This case is unlike *Santacruz-Betancourt* for two reasons, as the district court noted. First, the beam in this case was never pointed at a person, let alone a person's head and second, the fact that the vehicle moved through the light and was proceeding down the road, away from the police, is wholly inconsistent with the actions of a person attempting to point a firearm at someone else. In this situation, I think it was unreasonable for the officers to stop the car and, therefore, the court's ruling should be affirmed. I am authorized to state that Justice Skoglund joins in this dissent.